Good morning and may it please the court. I'm King Poore and I represent the secured creditor who I'll refer to as Torchlight and I'll also be referring to the debtor as Seasons. I'd like to reserve three minutes for rebuttal. You may do so, counsel. Just watch the clock. This case presents three issues. First, we have the threshold issue of equitable mootness and then we have two issues on the merits. First, the question of whether the collateral value should have reflected the more recent results. And second, whether the reserve account should be released before the plan was complete. Well, the threshold question, I assume, is the motion to dismiss for equitable mootness. You should address that one first. You're correct, Your Honor, and I'll turn to that right now. Equitable mootness is a doctrine that places a heavy burden on the party invoking it. And that's especially true when that party seeks to extinguish the constitutionally protected rights of the secured creditor. The most important factor and the one that really influences all other factors is whether the court can fashion what's been referred to as equitable or effective relief. So let me ask you about that. This is a case in which a third party put in a substantial equity investment into the hotel or into the apartment building and also made substantial improvements to it, spent in excess of $2 million, as I read the record. What relief do you want here? In this case, there's two matters which I think are very easily explained. Well, what's the last one? You win. What does the last line of our order say? What do you get? We get two things. The value of the collateral would increase by 5 percent. Put that issue aside for a second. The reserve account would be held in place. And our – we submit that that doesn't unravel anything. Well, what if the person who put $2 million into this property in reliance on a confirmed plan says, that's not the deal I made, can you give them back their money? They will get back the – they will get their money back at the end of the plan. Well, see, but no, that's not my question. The third party, the savior, maybe that's too high a praise. The white knight. The white knight, thank you. The white knight comes in, puts $2 million into the property in reliance on a plan. Part of that plan is that the reserve account will be released at some point. Part of that plan is that the – part of that plan assumes a certain valuation of the lien and payments ordered accordingly. You say, well, we want to tinker with that a little bit. It won't make any big deal to him. But don't we have to give – if that's the case, if we give you any relief, don't we have to at least provide a situation where the white knight can say, no, thank you, this was a close question for me, give me my $2 million back and I'll go home. And I'm not sure where that $2 million comes from. That's a long question, but my problem is I'm not sure how we can give you relief at this point without completely undoing the plan and saying to the white knight, you're free to leave. Well, first of all, Your Honor, the white knight, so called, has been intimately involved with this plan. It's not what has been referred to as an innocent third party. This is a party – No, but they did extend all this credit and all this investment in reliance on – they didn't do it until the plan was confirmed. Correct. And now you're saying unconfirm the plan, make it more favorable towards me, but keep them around. Don't they have the – don't you have to at least put them in a situation where they can walk away and take their money away? Well, if that – and I think that's highly speculative after doing everything they've done. If they would say after they've got their investment in here, the plan's been funded, and they're just going to walk. I don't know what – I mean, I suppose that on remand that's one possibility. But could the judge give them all their money back at this point? Could he give them all the money? Is there a fund of dollars from which the judge could transfer $2 million to white knight? I know. I don't want to make them – they may be a black knight, but to the knight. Is there a fund of $2 million that the judge could hand the knight back his money and say, okay, now we have a plan, now we're back to status quo because the secured creditor has won on appeal, and everybody's entitled to go back to where they were before that, which is to say we have no confirmed plan. Well, that would be up to the debtor as to whether the debtor would give back the money if the plan is completely – Is that a possible remedy here? You're saying we can – is there $2 million in cash that the debtor can hand back to the white knight? I think it would be up to the debtor. But it would also be – it's so speculative because the investor here, would they blow up the plan because they have to wait until the end to get their reserve account? I mean, every investor in a plan could basically say you can't – a secured creditor can't appeal because we're going to take – we're going to take everything and go home. Now, you can appeal. The question is whether you should have sought a statement. Well, didn't the investor put in $2.7 million, and the investor – I think 1.2 for improvements from 1.5 in the capital fund, and thinking at the same time, well, I'm going to get a million and a half back, so to speak. So the net that he was really putting in was 1.2. Right. And they will get that money back at the end of the plan. The question is whether they should have to wait until they have cured the arrearage. They'll get the money back. His question is whether they're going to get it later rather than sooner. Yeah. But they thought they were going to get it sooner. They want it sooner, and we're saying you can't get it back until – The plan says that they get it sooner. That's correct. So the question – I guess my question, maybe poorly phrased, is haven't they acted in reliance on the judge's confirmation of the plans? Certainly they have. And isn't that one of the critical elements of equitable mootness, that because we don't have a stay and parties other than the bankrupt have acted in reliance to their detriment, perhaps, on the plan, we shouldn't allow the plan to be undone at this point? Well, I think the case law says it's not just the debtor. It's the so-called innocent third party. If this were – if these were funds that would have to be retrieved from a body of creditors who have already received their payments, that's when courts find equitable mootness. Aren't there – isn't there a body of other creditors who have received their payments? I'm sorry? Isn't there a body of other creditors who have received their payments in addition to? Yes. And this – and the remedy we seek here doesn't touch anything. Well, that's what I don't understand, because the remedy you seek has to be that the confirmation will be undone, reversed, and that we will go back to see whether the plan is confirmed again. And I don't know whether it will be confirmed again. Well, the only thing that would – the only element, and this is where the courts say there's a very high burden. You have to show that the whole plan is going to be unraveled to the point where nothing is going to work. Now, is – if the plan is undone, the creditors get their money, the debtor here gets the key piece of getting their loan stretched out another six years to survive, I submit it's highly unlikely that this investor who was put in the money is going to say, I'd rather blow up the entire plan because I'm not going to get my money now. I mean, that would be – I think that's highly speculative. And any investor can always say that, and they're able to moot any appeal by any secured creditor that bears appeal. Can we move on to your merits argument? Sure. Before you do that, I want to ask you one question, and that is, did you move for a stay? We did not. And are we entitled to take that into account? That's one of the four factors. I would also add that it is also well-known and well-established that that is not a decisive factor, and it's really informed by the last factor, and that is, can equitable and effective relief be provided? So that's – it is a factor, but it's – But is one factor, along with perhaps the factor of third-party reliance, all of which seems to be pointing in the other direction? Well, it's third – it's what has been referred to as innocent third-party, and here you've got the investor who was intimately part of this case, knew what was happening, knew that there was an appeal, and that was really – Why does that make that investor not innocent? Well, the – In other words – The investor – Larger knowledge makes you not innocent. Well, I put it this way, is that the investor here is one that has – it's really part of the – it's part of the new debtor, and it has been part of the new debtor, and it's intimately involved with its future. So that's why it is – I don't think it falls within the category the courts look to, the so-called innocent third party. It's part of the debtor. Its interest is in having the debtor succeed, and the idea that they would go back and say, if we don't get the reserve account released now, and you're going to force us to wait, then we're going to – we're just basically going to let this debtor go into Chapter 7. That is highly, highly speculative, and I think that's – So tell me why Judge Marler erred in relying on a seven-week-old valuation. The reason is that the value originally was based upon estimated results. Two months later, it becomes actual. And in this case, when the debtor, Seasons, takes and adopts that for its own benefit, then we submit that the valuation that is closer to confirmation. But here's my difficulty. The judge has a three-day – a two-day evidentiary hearing. He has a bunch of witnesses. He makes a finding evaluation. The debtor submits projections about what the estimated value of the property will be in a year. And you say to the judge, well, now you ought to – now you ought to reevaluate the whole property. And the judge says, I just had a hearing, and those are projections, and I'm comfortable with what I did. How did he abuse his discretion under those circumstances? The reason is, if it had just been that, you'd have a different situation. But here, when the debtor says, we're going to adopt the new numbers to help our case to our benefit, and you, secured creditor, you may not use those, that's where – But the new numbers, were they not a projection of what the property would be worth in a year based on income that was projected? They were based upon actual results closer to the time of confirmation, and they were projections. But the thing that makes this material is that the debtor is seeking to benefit from these new numbers and saying, you, the secured creditor, cannot. Well, but you're not arguing about the inappropriateness of the use of these numbers for other purposes. You're saying that the results should have been a new valuation. Right. And I'm looking at what Judge Marler said, which is, look, I just did this. I had this big hearing. I just did it seven weeks ago. I was comfortable with it then. I don't think anything has changed sufficiently for me to do a new valuation. Why is that an abuse of discretion? Because when the debtor says, in addition, the debtor presents new numbers and says, we're going to take advantage of these for our benefit, then it's sort of a sauce for the goose, sauce for the gander. If the debtor is going to use these to its benefit, then, as Ehlers and all these other cases say, the secured creditor is entitled to the increase of any collateral during the course of the Chapter 11. And that's what's happening here. When the debtor tries to use it, then the secured creditor is entitled to use it. And you agree the abuse of discretion standard is the one we apply in this case? No, Your Honor. We submit that the – that there is – this is no traditional dueling experts. The numbers themselves are not disputed. And the original numbers were based upon the debtor's numbers. The new numbers were based on the debtor's numbers. It's really a question of whether you take the July 2010 or the September. So your argument is a question of law? Is that what you're saying? Well, we're saying that there's no disputed issue of fact here as to whether this – you should apply the later valuation. You might be burning up your rebuttal time on what isn't your strongest issue. And let me address the reserve account. We're down to two minutes. Let me reserve it because that is the $1.5 million question here. The reserve account was created by a loan agreement. It's a lien. It is a lien right. And the lien right comes from this loan agreement which says very clearly that if you're late, if you have defaults, then you may not release the collateral. Now, the plan reinstates the loan. It stretches it out. And that's what plans do. But the plan also has to pay this pre-bankruptcy arrearage. Now, the plan could have said it's going to pay everything up front. It didn't. It stretched that arrearage out also for the life of the plan. And so an illustration, I think, really helps understand what's at stake here. The difference between modifying a plan, which is modifying a loan, reinstating a loan, which happens with a plan, and destroying a lien right. Assume that the reserve account is released in 2013. Let's assume the next year the debtor goes into default in 2014. If that's the case, the reserve account is long gone. Under that scenario, by 2013, in order for it to be released, wouldn't you have received all the payments that pre-bankruptcy, that the pre-bankruptcy plan called you to have received? No, that's the essence of the loan. Tell me what you wouldn't have received. If we would not have received the piece that was in default before bankruptcy, that's now being stretched out during the life of the plan to 2022. So we would be out basically eight years of arrearages. And if we had the reserve account in place, if the reserve account was doing what it was supposed to do, the lien right, at that point, we would have been protected. But now we're in total protection now. Well, I know your time is short, but explain to me what needs to be done under the plan of reorganization for the reserve account to be accessed. Certain benchmarks need to be made. Certain benchmarks, correct. How are those benchmarks different than the benchmarks that existed before? Those are identical. They're identical. The benchmarks are identical. So if the same benchmarks that were in existence before bankruptcy are met by the creditor after bankruptcy, the creditor may access the reserve account, correct? If. But this is why it's not the plan. And I see my ---- Your time is well over, but please answer the question that you've been asking. Your Honor, what is different here is it's not just the benchmarks. It's paying the pre-bankruptcy late or arrearage that has not been paid under this plan, and that's being stretched out. I understand. So that's the essence of it. All right. Thank you, counsel. Your time has expired. Okay. Thank you. We will hear now from the other side. Thank you, Your Honor. Good morning, Your Honors. My name is Jeffrey H. Greenberg for the Aptly Caesars Partners. I think I want to start by just saying that probably the most important things that happen in a reorganization case is attracting new dollars into a failed organization and getting a valuation on the collateral that works with the expectations of the funding source. Because if the valuation is set higher than the person with the money, the new money feels is appropriate, he's not going to make the investments. And I think that the Court's comments so far this morning recognize those basic economics. And so I think that in the discussions of the case law that we've had from the appellant, we don't hear any response to Mr. Gettle's declaration that all of the business points contained in the plan were all part of the basis on which the check for a million-and-a-half dollars was going to get written, and it's all part of the reason. So that's step one. And step two is the concept of this entrepreneur that it could use its brain and its money to create a situation where a property with an 83 percent occupancy rate was going to be able to achieve at least a 90 percent occupancy rate and a debt service coverage ratio of at least 1.25 percent was the brass ring, the incentive, the reason for funding the plan. So let me ask you the same question I asked your opponent. Assume we find that error was committed below in reverse. What happens? Well, I think what happens, Your Honor, is that, first of all, I think the first part of that answer is that the secured creditor doesn't get to impose these new provisions of the plan that he suggests. I understand the judge would have to decide what was appropriate, but let's assume that we decided that the bankruptcy judge erred in confirming the plan because of the two reasons or one of the two reasons that they argue. What happens next? Just tell me practically what happens next. What happens next is that most probably, if not definitely, the funding partner says, I want my $2,660,000 back. I want a reasonable return on that money. I want a check for the $2.5 million to $4 million of value that my efforts have led to the value of this property, and that's what I want. Was the infusion of cash by the investor, a better name than White Knight, by the investor used to fund paying off other creditors? Yes. About $150,000 of third-party creditors were paid as part of the plan. I haven't calculated whether or not the stream of payments so far have equaled the amount of the arrearage. I don't really see anything in the record that I recall exactly what that arrearage is, but I don't think that that's relevant, because what goes on there is that the lender continues to say in his papers that the arrearage is being cured over the 12 years, and the test, of course, is under 1129B, whether or not we have a new contract, all prepetition defaults have been cured. And that was my question to your opponent on that, so let me see if you can enlighten me on it. With respect to the release of the reserve account, if we call this a do-over, or as you were, your obligations are the same as they were pre-default? Absolutely the same. So if you pay on a certain schedule, then the reserve account can be released? That's correct, and so I have been before plenty of courts talking about how we modified a loan agreement and whether it's fair and equitable, okay, talking about the provisions that we tinkered with. We didn't touch the debt service reserve account language at all, and so what the appellant is really saying is that they don't really like the idea that under the bankruptcy code we can restructure the loan, and that if the court confirms it because it finds all of the hoops have been jumped through, and all the requirements of the bankruptcy code to ensure that the court is saying it's probably going to get, you're going to get $11.6 million on a piece of property that if I let you sell it today, you're going to get $11.6 million. So that's the reality of the context in which all the judge is doing is saying, if you guys can hit 90% occupancy for a full year, and you can hit a debt service coverage ratio of 1.25, then you've done a great job, and just like the lender said at the time, we're no longer worried. And the idea that after that type of performance, all of a sudden, hypothetically, the debt is going to fall apart, well, if we have another 2007 or 2008, anything's possible. But otherwise, that's not a reasonable approach to the situation. And can you address the revaluation issue? Sure. I mean, I think you already did. We may have all been wrong, so tell us why. Sure. I mean, basically, first of all, the lender, as a matter of standard practice, asked the court to value the property before the confirmation. So the whole argument about what the exact date of the valuation is, is brought on entirely by the lender's request. And it has no idea when the confirmation trial is going to get set, or that the judge is going to have that confirmation trial in two weeks or two months or three months, probably somewhere in there. So that's part one. So that means that the only thing he has to talk about is a projection. And as you've already noted, that is a projection as to what the debtor believes the property's income and expenses will be, and what the debtor's numbers would translate into if you applied an 8.5 percent cap rate to the stream of income. And that projection was submitted to demonstrate the feasibility of the plan of reorganization? That's correct. And I want to make a point about this, and I refer the Court to Mr. Cole's projection. And it's at page 74 where he does a reconstructed cash flow statement. So you've heard the appellant tell you in his brief that it's all really a very simple matter. All Judge Marler had to do was deduct $21,000 from the NOI of the property, and then he could see that if you apply the cap rate, you're going to get an extra $500,000. And it was as simple as that. And you could just have, you know, a projection magically turn into a valuation one year earlier than its intended result, and in the absence of any of the analysis or judgment or credentials that an appraiser brings that the judge listened to for, as Judge Hurwitz, Justice Hurwitz mentioned, you know, for quite some time. There is no justice in the Ninth Circuit. I'm just Judge Hurwitz. Oh, well. But there are three judges on this panel who are very eager to hear your argument, Counsel. Okay. So you threw me off completely now. Yeah. So basically, it's not that simple. Well, I found it. I'm amazed, but I did find it. Okay. So if you look at what Mr. — you know, at what the appellant is saying in the record, and you look at Mr. Cole's appraisal and his cash flow statement, you will find that his income number was $10,000. $1,577,000 more than the debtor's projected income number, and that his expense number was $31,980 more than the debtor's expense number. In other words, the debtor thought it could run its property for less than Mr. Cole in his study judgment of the other student housing apartment complexes in Tucson judged, and Mr. Cole thought that the property would get more income than actually happened. So basically, the appellant's premises are wrong. The judge would have had, if he read, you're saying, read this projection, and you abuse your discretion by not letting a projection change your mind about hours and hours and hours of expert opinion that led to a conclusion of $11.6 million. And finally, when they used the number $500,000, that left out the $244,000 that Mr. Cole deducted from his valuation opinion, so that the total difference, if you just took the proposition being offered, would be $255,950 out of $22,700,000, or 1.13 percent. That would be the reason why Judge Marla abused his discretion. Counsel, I want to bring you back to the pending motion to dismiss as equitably moot. We heard this discussion with Mr. Poore having to do with the factors that we take into account, and he suggested that with respect to the innocent third party reliance point, that perhaps we're not dealing with someone who is an innocent third party. What's your response to his argument? My response is that there's no basis for that at all. You know, the funding partner was asked to look at this investment, to look and see if it would contribute. It insisted on having input into the plan, because of course it wasn't going to invest its money into a venture unless the economic terms made sense to it. There's nothing wrong with that, and it was wholly innocent in believing and expecting that the plan was, if the plan was confirmed and it performed, that it would reap the benefits through an ownership interest in the debtor. I do want to make one comment. So as I understand Mr. Poore's argument, it was essentially that it was, I may be misphrasing it, but if you were a previously existing creditor, then you're the kind of person we worry about in equitable mootness, but not the new guy who comes in. Assuming that's his argument. My reaction to that is, number one, I don't know of any authority to that effect, but more importantly, the way it works is it's very, very difficult. There's a very small niche of people or businesses that will take a step into the difficult world of reorganizing a business. And if, and when you do that, you have to comply with high standards. There can't be anything but totally up front, there was nothing in this case except the whole truth about why the money was being put in, what Mr. Fina's motivations were, everything was honest and above board, and there's nothing but pure innocence and reliance. I do want to talk about one thing here that was important to me in filing this motion to dismiss. And besides the fact that, you know, I was aggravated about the fact that they didn't return the debt service deposit after the type of performance that the debtor had, and I realized later than I wish I had that the investment of the extra million dollars was really affecting the performance, and there was going to be no way to, like, get that back. It was no way to get that back, you needed to file the motion, and then you decided Thorpe. And, you know, when you decided Thorpe, you said, we endorse a test similar to those framed by the circuits that have expressed a standard, colon. Now, you didn't say we endorsed the test that was framed by the circuits, you said similar, and you said if and then. We will look first at whether a stay was sought, for absent that, a party has not fully pursued its rights. If a stay was sought and not gained, we will then look to whether substantial consummation of the plan has occurred. Well, I said this if and then, and that says to me, and I don't know any other way to read it, if you don't file for a stay, your appeal is going to be dismissed for equitable mootness. Thank you very much, counsel, your time has expired.
judges: Piersol, O'scannlain, Hurwitz